SNYDER *v.* UNITED BENEFIT LIFE INSURANCE
COMPANY.

INSURANCE—LIFE INSURANCE—INSTRUCTIONS—THEORY OF CASE—
REQUEST TO CHARGE—EQUALLY DIVIDED COURT—COSTS.
   Charge to jury which did not fairly present theory of case of
      defendant insurer under unissued life insurance policy that
      there had been ·no unreasonable delay in its issuance before
      death of insured from accidental injuries *held,* reversible error,
      where request to charge embracing such theory had been pre-
      sented and refused, the court being equally divided as to
      whether or not insurance was effected as soon as applicant was
      found in good health by the insurer's medical examiner, and as
      to the matter of costs on appeal.

Appeal from Mecosta; Van Domelen (Harold), J.
Submitted April 3, 1963. (Calendar No. 21, Docket
No. 49,814.) Decided September 4, 1963.

Action by Harold J. Snyder and Diana Snyder
against the United Benefit Life Insurance Company,
a Nebraska corporation, for life insurance benefits
upon death of son. Verdict and judgment for plain-
tiffs. Defendant appeals. Reversed and remanded
for new trial.

*William A. Harper* (*Edward D. Wells,* of counsel),
for plaintiffs.

*Arthur M. Hoffeins,* for defendant.

O'HARA, J. Harold J. and Diana Snyder, plain-
tiffs, are the parents of Darrel Snyder, deceased.

REFERENCES FOR POINTS IN HEADNOTE
29A Am Jur, Insurance § 1942.

He died November 19, 1960, of injuries sustained in an airplane crash which occurred November 13, 1960. They are also named his beneficiaries in an application for a $25,000 life insurance policy directed to defendant company.

John S. McKenzie is a soliciting agent for defendant insurance company. In 1954, the agent sold a policy of life insurance to plaintiff father, and at various times in the period between that sale and September 20, 1960, he and the father discussed the prospect of selling additional policies covering the plaintiffs' 2 sons, Duane and Darrel.

On September 20, 1960, agent McKenzie came to the Snyder home with a view to the sale of a life policy on Darrel. By this time Duane had applied for and received his policy.

At the home the evening of the visit were Darrel, his mother, plaintiff Diana, Hazel, his wife, now widow, his grandmother, and later his father, plaintiff Harold J. Snyder. The meeting took place in the family dining room.

It is the claim of the plaintiff that oral representations were made by the agent on diverse occasions, including the time at which a life policy was sold to deceased's brother, and again on the night deceased signed his application, which were completely at variance with the printed application form. Specifically the form of the application contained the following questions—answered affirmatively but in the agent's handwriting:

"And do you agree that the company is not bound by any statement made by or to any agent unless written herein  *  *  *  and do you further agree that there shall be no liability hereunder until a policy shall be issued, and delivered to and accepted by you while in good health and free from injury."

Plaintiffs contend, and support by testimony of deceased's father and mother (over strenuous objection) and deceased's wife, that the agent said in substance: "You are insured as soon as you have a medical examination and leave the medical examiner's office a healthy man." They further contend, and support by testimony, that a medical examination was made and a requisite urine specimen taken and analyzed. The examining physician testified he found the urine specimen negative, and that the physical examination disclosed nothing to disqualify deceased as an insurance risk. He additionally testified that he sent the completed medical examination blank and the urine specimen to the company home office at least a week before deceased sustained the injuries which caused his death 6 days later. The additional claim of plaintiff is that the agent did not show the application blank to deceased, nor read its provisions to him, but merely asked him questions to which he, the agent, wrote down the answers and only told deceased to sign the blank on the signature line. Plaintiffs assert their total reliance upon the agent's alleged representations, to the exclusion of the application form. The total first annual premium was paid by the agent under an agreement with plaintiff-father that the agent would later be reimbursed therefor. Admittedly the agent fulfilled this commitment but was not reimbursed therefor until after deceased's injury.

The declaration, in a single count, alleges actually somewhat contradictory theories. Paragraphs 5, 6, and 7 assert the agent's representations, the reliance thereon, the satisfactory completion of the medical examination and urine test, and their "submission" to defendant by mail. Paragraphs 9 and 12 allege an unreasonable delay after receipt of the examination, the urine specimen and the first premium with

a consequent waiver of any conditions precedent to the effective coverage of the deceased.

Defendant contrariwise denies the authority of the agent to alter the terms of the contract and denies in fact that he made such representations. The company urges strenuously that assuming the agent made such representations, there was no reliance upon them by plaintiffs under their own testimony. It is the insurer's further claim that the urine specimen was not in fact sent by the medical examiner on either date he asserts he sent it. There is a strong suggestion in their testimony that it was not sent until after deceased was injured and that the medical report was never sent—at least never received by it. The company denies any undue delay in processing the application for the reason that there was never in the office the precise item necessary to process the application. They emphasize that this aspect of the case formed no part of the claim in the declaration and that plaintiffs' counsel affirmatively denied that such was a part of their claim—and further that the burden of establishing undue delay was plaintiffs' and that such burden was not met.

On these controverted factual issues, the case was submitted to the jury under a general charge and the jury returned a verdict in the full amount of the unissued policy—$25,000.

It must be conceded that much, if not all, the force of plaintiffs' first theory, or the first facet of their declared theory, was vitiated by their own testimony on cross-examination. Accepting the claim of plaintiffs that the application form was not read and that applicant did not see the 2 limiting provisions, namely, (1) "The company reserves the right to require medical examination of *any* applicant," and (2) "Is applicant being examined? Yes," plaintiff Harold Snyder still testified as follows:

"*Q.* Now, you do know that certain things had to be done with respect to the examination, did you not, Mr. Snyder?

"*A.* I figured there were.

"*Q.* And what were these things?

"*A.* Examination, for one.

"*Q.* And what else?

"*A.* A urine specimen.

"*Q.* And what would happen to that urine specimen?

"*A.* It would have to go to the home office.

"*Q.* And what would have to happen to the medical examination that was made?

"*A.* It would have to be approved.

"*Q.* At the home office; is that correct?

"*A.* Right.

"*Q.* Uh-huh, and the urine specimen also would have to be approved?

"*A.* Right."

The coplaintiff testified in the same tenor with some semantic difficulty over the word "accepted":

"*Q.* Now, referring to this nonmedical business. You realize that Duane, or that Darrel, would have to have a medical examination, did you not?

"*A.* That's right.

"*Q.* And, as a matter of fact, you testified before that Mr. McKenzie gave you some medical papers; is that correct?

"*A.* He gave them to Darrel.

"*Q.* Well, gave them to Darrel, but you saw him give them; is that correct?

"*A.* That's right.

"*Q.* And did you also see him give Darrel a little specimen bottle?

"*A.* Yes.

"*Q.* Would that bottle be somewhat similar to this one?

"*A.* It looks about like it.

"*Q.* It looks about the same, and what did he tell him he'd have to do with reference to the bottle?

"*A.* Put a specimen in it.

"*Q.* Uh-huh, and take it where?

"*A.* To the doctor.  *  *  *

"*Q.* Now, Mrs. Snyder, you knew that this specimen that Darrel was to give was to be delivered to Dr. Putzig, right, or that he was to give a specimen to Dr. Putzig. Let's put it that way. Correct?

"*A.* That's right.

"*Q.* And you also knew, did you not, Mrs. Snyder, that the specimen then would have to be delivered to the home office of the company in Omaha, Nebraska; is that correct?

"*A.* Uh-huh.

"*Q.* As a matter of fact, in the policies that your husband had taken out previously, the policy that your boy, Duane, had taken out previously, that's the same way that that was handled; is that correct?

"*A.* I believe it was, but I can't remember that.

"*Q.* And you also knew, did you not, Mrs. Snyder, that the medical report of Dr. Putzig had to go to the home office; is that correct?

"*A.* Yes.

"*Q.* You heard your husband testify to that fact, and you knew, did you not, that both the medical report and the urine specimen would have to be approved at the home office, is that correct?

"*A.* Wouldn't the medical —

"*Q.* Could you—do you understand the question? You knew, did you not, that before an insurance policy could be issued to your boy that both the medical report and the urine specimen would have to be okayed by the home office; is that correct?

"*A.* Accepted, I didn't know about the okay.

"*Q.* Well, accepted. You say accepted, does that mean to you the same thing as being okay?

"*A.* Yes.

"*Q.* Uh-huh, and both you and your husband did know that; is that correct?

"*A.* Yes."

In view of this testimony, it is difficult to understand plaintiffs' claim that coverage attached immediately the deceased walked out of the doctor-examiner's office "with a clean bill of health."

On the issue of undue delay there is a factual conflict but with a serious question as to whether plaintiffs sustained their admitted burden. Significant is plaintiffs' counsel's remark in his argument contra the motion for directed verdict:

"Now, Your Honor, this company is not accused of being dilatory. I haven't found this in the testimony or even in the declaration."

On this theory, no motion was ever made to conform the declaration to the proofs. However, after the close of plaintiffs' proofs and the denial of the motion for a directed verdict, and when the defendant's case was being developed, a new theory of ambiguity of the application developed. It was bottomed chiefly upon inconsistencies in the application form which defendant claimed was obsolete and improperly used by the soliciting agent. The blank contains the legend "nonmedical only—use regular application for medically examined cases." Buttressing this statement with the testimony of the chief witness for defendant that the company does issue policies effective on examination, and some additional concessions on cross-examination that certain company advertising for an ordinary life plan recites "your protection is established with your first deposit," a persuasive basis for an ambiguous application form was made. However, as urged by defendant this is at total variance with the concept of complete reliance on the agent's oral representations and wholly unrelated to the theory of undue delay and waiver.

On this somewhat confused conflict of theories and again after defense motion for a directed ver-

dict, the jury received the case. Defendant's requests to charge in the form submitted were all rejected by the court and his charge was general in nature. It is in the charge as related to the testimony adduced that we find merit in defendant's position on appeal.

We acknowledge copious briefing, ample appendices, and oral argument by appellee, but we believe the essential issue is narrow and obviates discussion of the plethora of citation.

Persuasive is the concluding paragraph of defendant-appellant's brief:

"The trial judge's charge to the jury was in error because, among other things, it failed to give, as requested, defendant's theory of the case."

Fairly read in its entirety we must agree, not unmindful in so holding, of appellees' contention that if error it were, it must be shown to have been prejudicial error.

After the general statement of the theories of plaintiffs' case, without any distinction as to which of the 3 required what specific proof, the court said:

"Now, if you find that a contract existed covering the life of the deceased based upon the agreement between the deceased and McKenzie, then you will find for the plaintiffs. If you find that a contract based upon Mr. McKenzie's statement that the deceased was covered from the time of the physical examination did not exist, then you pass on to the next question—Did the defendant delay an unreasonable length of time in accepting or rejecting the application? *In considering this question you should consider the testimony of Dr. Putzig that he sent the medical report on November 3, 1960, and he sent the urine specimen on November 5, 1960, which specimen at the earliest would have reached the defendant on November 7 or 8, 1960, and that the deceased*

*was injured on November 13, 1960.*" (Emphasis supplied.)

The composite effect of the whole charge with this pointed reference to plaintiffs' theory limited the jury in effect to the consideration of none of the testimony—lengthy and detailed—that the company could not act timely because it never received the completed medical examination. Under the equivocating nature of the medical examiner's testimony as to the date of mailing and the manner in which it was mailed, as against the supervising underwriter's testimony that it was not in fact received, defendant was entitled to instruction that an issue of fact on this precise point was created. It was the whole basis of the defense to the plaintiffs' second declared theory in paragraphs 9 and 12 of the declaration. As the issues were submitted the court's charge in its essence was:

"If you believe plaintiffs' testimony, you will find for them, if you disbelieve them, you will not."

A careful reading of the charge reveals that nowhere did the court outline, in anywhere near equal detail, defendants' theory, nor does it pose those evidentiary or testimonial premises of fact-finding which would have entitled defendant to a verdict.

We have long recognized the overwhelming impact of the charge of the court upon the jury, and the need for the most meticulous avoidance of emphasis on the theory of one or the other of the parties to a cause. Few, if any members of the bar with experience as trial advocates, are not acutely aware of the marked change that takes place in the whole mien of the jury when the bombast of argument is concluded and the presiding judge, reminding the jurors of their oaths, to take the law applicable to the facts from him, begins his charge. Early in our State jurisprudence, this Court announced:

"Appellate courts *must* presume that one occupying so important a position as that of circuit judge can influence a jury." (Emphasis supplied.) *McDuff* v. *Detroit Evening Journal Co.,* 84 Mich 1, 10 (22 Am St Rep 673).

Abiding this premise, the effect of the presentation of the theories in the manner done here is manifest. It amounted to an exclusion of the consideration of the defendant's theory and provided no guidance in the application of the factual evidence adduced by it to that theory. On this point this Court unanimously deciding recently, quoted with approval what we believe to be the controlling principle as stated in 53 Am Jur, Trial, § 626, p 487:

"Each party to an action is entitled to have the jury instructed with reference to his theory of the case, where such theory is supported by competent evidence and the instruction is properly requested, and this although such theory may be controverted by evidence of the opposing party." *Schattilly* v. *Yonker,* 347 Mich 660, 666.

The situation here meets all the requirements of the foregoing holding. Mr. Giller, defendant's principal witness, testified:

"*Q.* Now you say that to your knowledge the medical report never came into the home office?
"*A.* That's correct."

This testimony is in direct factual conflict of Dr. Putzig's:

"I filled out and completed this form   *   *   *   I put down my findings and I couldn't find the envelope so I typed one out and I took that and 3 other envelopes to Edmore and I mailed them there."
"*Q.* And to whom did you address that envelope?
"*A.* To the United Benefit Life Insurance Company.

"*Q.* And you personally?
"*A. I think they are in Chicago, I'm not sure.*
"*Q.* Omaha?
"*A.* Omaha, Nebraska." (Emphasis supplied.)

Particularly in view of the foregoing, defendant was entitled to some reference to its factual version of the question of mailing and receipt. Defense counsel specifically requested a charge that "*if you believe the testimony of the defendant that no report of the medical examination was ever received by it * * * then you must bring in a verdict in favor of the defendant.*" The whole theory of defendant's defense is contained in 1 paragraph of 18 lines of the court's charge. It is barren, as is the balance of the charge, of any reference to the issue of non-receipt of the examination. Under the charge here, defendant may have had a slightly better chance than the *didus ineptus* recently adverted to by Justice BLACK in his opinion in *Mack* v. *Precast Industries, Inc.,* 369 Mich 439, 448, but if it did, it was only infinitesimally more so.

At the conclusion, the court asked counsel:

"*Q.* Do you have anything further, Mr. Harper?
"*A.* No, Your Honor.
"*The Court:* Mr. Hoffeins? [Defense counsel.]
"*Mr. Hoffeins:* No comment other than the ones I had in chambers, Your Honor."

By this time of course the requests to charge had been refused.

For the reason hereinbefore specified and under the holdings in *McDuff* and *Schattilly,* we are constrained to reverse. The verdict is set aside and the cause remanded for a new trial. Costs to the defendant.

CARR, C. J., and DETHMERS and KELLY, JJ., concurred with O'HARA, J.

SOURIS, J. (*concurring in part*).  Plaintiffs' claim
is that their son applied for life insurance with de-
fendant, naming them as beneficiaries, and fully com-
plied with all of defendant's requirements for such
insurance, including completion of the defendant's
application, payment of the initial premium and sub-
mission to a physical examination.  Upon their son's
subsequent accidental death, plaintiffs claim as
named beneficiaries the face amount of insurance for
which he had applied, basing their claim on 2 alterna-
tive theories:  (1) that an insurance contract between
decedent and defendant became fully effective upon
decedent's satisfactory compliance with defendant's
requirements, defendant's soliciting agent having
represented to decedent and plaintiffs that insurance
coverage would attach immediately upon completion
of decedent's medical examination if the examiner
found him to be in good health; or, (2) that defend-
ant's unreasonable delay in accepting or rejecting
decedent's application estops defendant from deny-
ing liability after his accidental death.  Each theory,
in my view, has more merit than Mr. Justice
O'HARA's opinion would suggest.

In *Bleam* v. *Sterling Insurance Co.*, 360 Mich 208,
we held that an insurance agent could bind his com-
pany by oral representations regarding the effective
date of insurance coverage for which application
was made when ambiguity was found between the
written provisions of the application and an adver-
tising folder to which was attached a receipt used
upon applicant's payment of the advance premium.
It was conceded in *Bleam*, as it is undisputed in this
case of Snyder, that the agent did in fact represent
that coverage would become effective earlier than
stated in the application.  Our decision in *Bleam* was
based upon our conclusion that either the applicant
and the agent were mutually mistaken with respect
thereto or there was a unilateral mistake on appli-

cant's part prompted by the agent's fraudulent misrepresentation,—in either of which events the agent's principal would be bound and the Court justified in reforming the resulting contract. We held that evidence of the agent's representations was admissible because of the existence of the ambiguity in the provisions of the advertisement and the application, considered together, citing *Wadsworth* v. *New York Life Insurance Co.,* 349 Mich 240.

There is at least equal ambiguity in the circumstances of the case at bar to require reference to the conversations between defendant's agent and these plaintiffs and their decedent son.* In the first place, all concerned knew that the insurance coverage for which application was made required the applicant to pass a medical examination. Nevertheless, defendant's agent used a printed form of application designed for *nonmedical* insurance policies. Defendant's underwriter witness testified that agents were instructed to use such applications even when selling medical policies because, unlike the regular application for policies requiring medical examination, the nonmedical application required applicant to supply certain information about his medical history which the company's underwriters found useful in expediting the issuance of policies to the advantage of both the company and its insureds. Whatever the reason for such instructions, the application was not designed for the use to which it was put.

Second, the application on its face disclosed it was for use only when nonmedical policies were being sold, but it also provided, on the contrary, that the company could require a medical examination. At

---

* Although defendant's counsel initially objected to plaintiffs' testimony with reference thereto on the ground that such evidence was equally within the knowledge of the deceased, he waived any objection he might have had by thereafter pursuing the matter himself in cross-examination of the plaintiffs. Furthermore, decedent's widow, not a party herein, testified regarding the same conversations.

the top of the application appear the words: "Non-medical Only—Use regular application for medically examined cases." On the reverse side of the application, on the other hand, at the bottom of the page, appear the words: "the Company reserves the right to require medical examination of any applicant."

Third, there appears on the application a schedule of nonmedical policy limits of $2,500, $5,000 and $10,000 depending upon applicant's age, the maximum of which was substantially below the $25,000 insurance for which the decedent applied and paid in advance the first annual premium. The record discloses that the schedule had been substantially increased (to a maximum of $15,000) about a year before decedent's application, defendant's agents notified thereof and new applications printed but, inexplicably, this agent used the superseded form.

Fourth, defendant's underwriter testified that when the regular application for policies requiring medical examination is used, insurance coverage attaches as of the date of the medical examination if a policy is subsequently issued. Apparently, in such cases coverage is related back to the applicant's medical examination probably on the theory that the risk undertaken is determined as of that date and, therefore, that it is entirely appropriate to commence coverage and amortize the premium as of that earlier date rather than the date the policy is ultimately formally issued. Whether this defendant's regular applications for such policies contained language expressly so providing (as, for example, the "binder clause" quoted from the policy involved in *Wadsworth* v. *New York Life Insurance Co., supra,* 249, 250) does not appear in this record. However, language which does appear in the nonmedical policy application, inappropriately used in this case for a policy requiring medical examination, expressly negates any liability upon the company "until a pol-

icy shall be issued, and delivered to and accepted by [applicant] while in good health and free from injury." However appropriate to a policy not requiring a medical examination, and therefore lacking logical justification for relating back the effective date of insurance coverage, such language is inappropriate for use in selling defendant's policy which does require a medical examination and the effective date of which normally is related back to the date of the medical examination.   Defendant certainly would not be heard to say that it could issue such a policy effective as of the date of the medical examination if applicant maintained good health during the interim until actual issuance, delivery and acceptance of the policy, in which event there would have been no risk run for the pro rata share of the premium earned, but that if applicant's health became impaired by illness or injury during such interim, it could refuse to issue the policy and thereby avoid the enhanced (or matured) risk for which the advance premium had been paid.   See *Starr* v. *Mutual Life Insurance Co. of New York* (1905), 41 Wash 228 (83 P 116), and other cases cited in 2 ALR2d 943 at 967.

The point of all of this is that the application used was inappropriate for the purpose intended and it could not, and did not, reflect the understanding of the parties regarding the kind of insurance policy being purchased nor its effective date.   In short, its language was patently ambiguous requiring parol evidence to explain that a policy requiring medical examination was intended, contrary to the application's terms; that the policy limits stated on the application were not applicable to the policy sought to be purchased; and that, contrary to the application's terms, the company could not deny the risk on the ground that applicant's health became impaired by illness or injury subsequent to his satis-

factory medical examination, but before formal issuance, delivery and acceptance of the policy. With reference to the latter point, the effective date of coverage, plaintiffs' evidence was that all parties clearly understood that applicant would be fully insured as soon as he was found to be in good health by defendant's medical examiner, in conformance with defendant's usual practice when the correct application form for such policies is used. All parties understood this to be so, because defendant's agent so stated. As in *Prudential Insurance Company of America* v. *Cusick,* 369 Mich 269, defendant did not even attempt to refute such testimony, by producing its agent whose lips had been unsealed by the plaintiffs' own testimony relating to such matters equally within the knowledge of the deceased.*  Absent his testimony, we must presume he would not deny having made the representations it is claimed by plaintiffs he made.

Had the case been submitted to the jury on the foregoing theory alone and had the jury returned a verdict for plaintiffs, defendant could not urge reversal. However, as Justice O'HARA has pointed out, the jury was also permitted to consider plaintiff's alternative theory that defendant's allegedly unreasonable delay in issuing the policy estops it from denying liability after the insured's death. I agree with Justice O'HARA's conclusion that the trial court's charge to the jury did not fairly present defendant's theory on this branch of the case thereby requiring our reversal of the judgment on the jury's verdict and remand of the case for new trial. However, I do not believe defendant was entitled to make the extreme claims it did with respect to the factors to be considered by the jury in determining whether its delay was unreasonable.

* See CL 1948, § 617.65 (Stat Ann § 27.914).—REPORTER.

Defendant argues strenuously that it should be absolved of liability because its evidence proved that it never received in its home office the report of applicant's medical examination and that the applicant's urine specimen was not received until after applicant's injury from which he subsequently died. The trouble with this argument, even if we assume to be true defendant's proofs that the medical report was never received by it and that the urine specimen arrived late, is that defendant seeks to avoid liability by reliance upon the failures of its own agent,— the examining physician. The record shows that the examining physician, called as a witness by plaintiffs, was defendant's agent. Arrangements for the examination were made by the company, payment therefor was to come from the company, and the report of the examination was to be made to the company. See *Brasier* v. *Benefit Association of Railway Employees,* 369 Mich 166 (94 ALR2d 1385), and cases cited therein.

Defendant's examining physician testified he mailed the completed medical report to the company's home office 2 days after the examination upon completion of his analysis of applicant's urine specimen he had that day received. Failure of the company actually to receive the report at its home office, or its subsequent loss after receipt, cannot be attributed to applicant or plaintiffs on any basis which I can conceive. Nor can they be charged for the delay in the doctor's mailing of the urine specimen to the company's home office. He testified that immediately upon receiving the specimen he conducted a Benedict analysis upon it and found no trace of sugar in applicant's urine. The finding was recorded upon his medical report and the report mailed that day to defendant's home office. The doctor testified further that he did not also then mail the urine specimen, as he was required by

the company to do, because after transferring it to the mailing container he discovered that the mailing label was inside the container and it had to be "fished out" and dried before it could be used. He testified that it did dry in 2 days and that he did then mail it to the company in sufficient time to arrive there in the normal course of events about a week before applicant's injury.

Under such circumstances, it would seem to me that plaintiffs are entitled to have their theory of unreasonable delay tested by the jury from and after delivery of the urine specimen to defendant's examining physician. Whatever delays thereafter occurred are chargeable not to them but, rather, to the company.

One further matter should be mentioned. Defendant has argued throughout this case, in the trial court and on appeal, that the day of applicant's injury, rather than the day of his death, should be considered the terminal date in the jury's determination whether defendant delayed unreasonably in issuing its policy. However, as noted earlier in this opinion, defendant's underwriter testified that insurance policies requiring medical examination are issued by defendant effective as of the prior date of medical examination, at least, as in this case, where the first premium payment has been made in advance upon execution of the application; and, as we have also noted, it would be unconscionable to permit defendant to deny liability for such coverage in the event illness or injury or death occurs subsequent to physical examination but before formal issuance of the policy, while permitting defendant to take a risk-free ride on the advance premium in the event applicant maintains good health during such interim. For the same reasons, I believe defendant's obligation to issue a policy within a reasonable time after applicant's compliance with its requirements and payment

of an advance premium is not terminated by applicant's interim illness or injury or death.

Subject to the foregoing, I concur in reversal and remand for new trial. I would not, however, award costs to either party.

BLACK, KAVANAGH, and SMITH, JJ., concurred with SOURIS, J.