PEOPLE v. ROBERT W. JONES.

1. CRIMINAL LAW—NEGLIGENT HOMICIDE—ELEMENTS.
   Showing negligent homicide by operation of an automobile consists of showing 4 elements, (1) that defendant drove a vehicle on the public highway, (2) that he was negligent in operation of his vehicle, (3) that his negligence caused an accident, and (4) that as a result of that accident someone received injuries which caused his death (CL 1948, § 750.324, as amended by PA 1965, No 38).

2. SAME—NEGLIGENT HOMICIDE—INJURIES—DEATH.
   Lump on neck of 6 year old child noticed after the school bus she was riding in was hit by defendant's car *held*, sufficiently

REFERENCES FOR POINTS IN HEADNOTES

[1] 7 Am Jur 2d, Automobiles and Highway Traffic §§ 274, 275, 278, 283; 40 Am Jur 2d, Homicide § 91.
[2] 7 Am Jur 2d, Automobiles and Highway Traffic §§ 274, 337.
[3] 7 Am Jur 2d, Automobiles and Highway Traffic §§ 274, 345.

connected by the evidence in prosecution for negligent homicide by operation of an automobile to her death 5 days later where she was examined by a nurse and doctor after the accident but neither recalled her specifically, she was taken to hospital by her father after she held her head and screamed, X-rays showed no abnormality, and after her death doctors found she had fractures at base of skull and a hemorrhage between the bone and coverings of the brain (CL 1948, § 750.324, as amended by PA 1965, No 38).

3. SAME—NEGLIGENT HOMICIDE—INSTRUCTIONS.

Instruction to jury that there was no evidence of negligence in the medical treatment of the girl which could be termed an intervening cause of death in prosecution for negligent homicide by operation of an automobile was proper absent evidence showing negligence in medical treatment raising in issue an intervening cause of death (CL 1948, § 750.324, as amended by PA 1965, No 38).

Appeal from Ottawa, Smith (Raymond L.), J. Submitted Division 3 March 6, 1968, at Grand Rapids. (Docket No. 4,009.) Decided August 26, 1968.

Robert W. Jones was convicted of negligent homicide. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *James W. Bussard,* Prosecuting Attorney, and *Max R. Murphy,* Assistant Prosecuting Attorney, for the people.

*Harry Lieffers, Jr.,* for defendant.

HOLBROOK, P. J.  On May 22, 1967, defendant, Robert W. Jones, was convicted by a jury of the offense of negligent homicide by operation of an automobile.*

---

* CL 1948, § 750.324 as amended by PA 1965, No 38 (Stat Ann 1968 Cum Supp § 28.556).

Our determination of the following 2 issues will answer the questions raised by defendant on appeal:

(1) Was the evidence presented by the prosecution sufficient to convince beyond a reasonable doubt as to the existence of an unbroken chain between the injuries received by Darcy Moody in the collision and her subsequent death?

(2) Did the trial court err in instructing the jury that there was no evidence in the case of negligence in the medical treatment of Darcy Moody which could be termed an intervening cause of death?

In *People* v. *Paulen* (1950), 327 Mich 94, 99, the Michigan Supreme Court held an instruction stating the following elements of negligent homicide correct:

"First, that the defendant drove a vehicle on a public highway. * * * Second, that he was negligent in the operation of his vehicle. Third, that his negligence caused an accident. Fourth, that as a result of that accident someone received injuries which caused his death."

3 Gillespie, Michigan Criminal Law and Procedure (2d ed), § 1687, p 2037. The gist of defendant's assertions of error is that the prosecution failed to produce evidence sufficient to convince beyond a reasonable doubt of the existence of an unbroken chain between the injuries received by Darcy Moody in the collision and her subsequent death. This relates solely to the fourth element of negligent homicide. We find the following facts present in the record, if believed by the jury, to constitute evidence sufficient to convince beyond a reasonable doubt:

Darcy Moody, age 6, who died July 24, 1966, was a passenger in a school bus on the morning of July 19, 1966, at the time of a collision with a vehicle driven by defendant. The bus driver, Verona R. Barrett, testified on direct examination as follows:

"*Q.* Do you recall at all talking to Darcy Moody immediately after the collision after the bus came to a stop and you examined the other children?

"*A.* Yes, I asked Darcy if she was hurt and she lifted her pony tail and said that the back of her neck hurt and that was—it was a small red mark."

A registered nurse checked the children for first aid treatment at the scene of the accident, but didn't recall Darcy Moody. Dr. Lown examined the deceased shortly after the accident but didn't recall her specifically. Darcy Moody was taken to her home in the early afternoon following Dr. Lown's examination by Verona R. Barrett who testified in part as follows:

"*Q.* Did you talk to her parents at all, her father?

"*A.* I would imagine I talked to her stepmother. I thought it was her mother at the time, and I told her we had been in an accident and there was a bruise at the back of her neck and —.

"*Q.* Did you at any time look at that bruise again after you initially looked at it at the time of the collision?

"*A.* Just when I showed Dr. Lown where she was injured."

The deceased's father testified as follows:

"*Q.* When you were home at noon, you say you saw Darcy at that time, right?

"*A.* I did.

"*Q.* And did she make any complaint to you at that time of any injuries?

"*A.* She complained of the back of her neck behind her left ear and which I observed at the time and there was quite a large goose egg there.

"*Q.* There was a goose egg?

"*A.* It was quite large at that time.

\* \* \*

"*Q.* She told you she had been to see the doctor?

"*A.* Yes.

"*Q.* And then what did you do then?

"*A.* Oh, we probably stayed in the house maybe 5, 10, 15, 20 minutes and then we left for downtown.

"*Q.* And what time did you get back from downtown?

"*A.* Approximately 5:30.

\* \* \*

"*Q.* What did you find at this point?

"*A.* Well, at this point she was in bed and she had vomited and I tried to call Dr. Kremer, but he was out at the present. And I waited, oh, it must been about 15 minutes and she had one of these attacks while I was there.

"*Q.* What do you mean by attack, would you describe it?

"*A.* She would grab her head and scream as if she was in quite severe pain. And I witnessed one of these and I decided I might better do something and I again tried to call Kremer and to no avail. Then we put her in the car and took her to the hospital.

"*Q.* You took her to the hospital. At this point did you make any—when you took her to the hospital, just prior to taking her to the hospital, did you observe this goose egg at all again?

"*A.* Yes, I would say it had dissipated quite a bit. It was about half the size of when I first noticed it originally.

"*Q.* Then you took her to the hospital?

"*A.* I did, yes."

Dr. Lamberts, a neurological surgeon, testified in part as follows as to events occurring at the hospital:

"X-rays had been taken; they were already dry. We went down to see the X-rays; found no abnormality on these X-rays. And at that time I gave the opinion that it was highly likely there was another cause for this child having headache and being sick. After all, the most common cause for having head-

ache and being sick in a six-year-old child, especially in the summer, is flu. There is more of it around.

"Because we found nothing, we said we had better watch this child overnight and every evidence shows that this child is not hurt and probably can go home the next morning.

"It was on the following morning that I went back to Butterworth Hospital and there met my associate. We were told that early in the morning this child had had some strange spell in which she stiffened out, but it had lasted very shortly and had gone away and the child had again resumed her more or less sleepy attitude, but had shown no change in blood pressure, pulse, temperature or anything else.

"At that time we held a conference around the baby's bed—around Darcy's bed—one or two pediatric residents, the intern, my partner and myself were standing around discussing what this possibly might be, whether this was an infection whether this was an injury, or the nature of the difficulty with the child.

"Suddenly the child stiffened out and before our eyes, while six of us were standing there, stopped breathing. We immediately started mouth to mouth respiration and got a respirator and started artificial respiration.

"At this time we had no diagnosis. While my partner went down to take another look at the X-rays which he saw—which he determined in his own opinion were completely normal, the rest of us did a spinal puncture and found there was blood in the spinal puncture. At that time the child was on the respirator, had dilated fixed pupils.

"We had no diagnosis still, but we assumed that this child must have had a hemorrhage into the stem of the brain. We had no positive evidence that this child had been in an accident, except hearsay, that had been in a bus, the bus had been in collision, but seemingly the child hadn't been injured. And we did not know how to relate this episode to what our findings were.

"From then on it was a matter of trying to resuscitate the child, but it shortly became apparent that this child was not going to be resuscitated. * * *

"*Q.* After she expired, did you determine what the symptoms were?

"*A.* Yes, after—at post-mortem it was found she had had fractures at the base of the skull and also that she had a hemorrhage between the bone and the coverings of the brain, which we call an extra or epidural hemorrhage. Moreover, it was at the very base of the skull and not where they usually occur. * * *

"*Q.* Now, doctor, from your experience and your practice, is a blow to the head consistent with what happened to this child?

"*A.* Yes, I think she had a blow to the head in some fashion.

"*Q.* And this hematoma you previously talked about, this results from generally a blow to the head?

"*A.* Yes.

"*Q.* From the history of this particular child, is a blow to the head consistent with the symptoms subsequently—or signs and subsequently symptoms that developed to this child?

"*A.* Yes, but only in retrospect. * * *

"*Q.* But the autopsy you determined where the fractures were, is that right?

"*A.* Yes.

"*Q.* In other words, this is the only way you feel fractures could be determined?

"*A.* That's correct."

Dr. Young, a pathologist who performed the autopsy, testified as follows:

"*Q.* Can you tell us what your findings were at that time?

"*A.* The major findings, as far as the cause of death was concerned, was a large epidural hema-

toma. This is a large hemorrhage in the posterior fossa of the skull on the left and this had produced compression of the brain and consequently death.

\* \* \*

"*A.* Underlying the hemorrhage in the skull there were two small fractures. The fracture sites passed across several large vessels which lie within the lining of the skull and presumably one of these vessels was torn and this was the source of the hemorrhage. And an injury such as this is usually caused by a blow to the head.

"*Q.* From your observation in your examination here, post-mortem examination, could you determine how long this condition existed generally?

"*A.* From examining the hemorrhage, the closest you could say, it was quite recent, several days. It would be hard to be much more precise than that. It is not a long-standing thing, I can say that definitely."

The injuries of Darcy Moody were not recognized or diagnosed initially as mortal; however, evidence resulting from the post-mortem examination connected the injuries to the cause of deceased's death. This is all the fourth element of the negligent homicide statute requires.

Defendant contends that the trial court committed error in giving the jury the following instruction:

"Now, members of the jury, I'm going to anticipate that perhaps something is going to arise in your deliberations concerning the question as to whether or not there was any negligence on the part of any doctors or nurses, or others, which could by any stretch of the imagination be called or termed an intervening cause of death.

"And I will charge you and be responsible for this, that in my opinion, there is no evidence in this case revealing any conduct on the part of any doctor, or nurse, or intern, from which we can conclude or

infer that anybody was negligent in treating Darcy Moody. And the court being of that opinion and being of the opinion there is no evidence for the jury to consider, you will just free your minds from that particular problem, if it is a problem."

On review of the entire record we are in agreement with the trial judge, *i.e.,* there was no evidence in the case that the medical treatment of Darcy Moody was negligent in any manner (grossly erroneous or unskillful so as to have been the cause of death; *People v. Townsend* [1921], 214 Mich 267. Also, see *People v. Cook* [1878], 39 Mich 236, 240). The charge was a proper one in the absence of evidence showing negligence in medical treatment raising in issue a claimed intervening cause of death. *Snyder v. United Benefit Life Insurance Company* (1963), 371 Mich 36; *People v. Welke* (1955) 342 Mich 164, 170.

Affirmed.

QUINN and McINTYRE, JJ., concurred.