FAULDS *v.* DILLON.

1. TRUSTS—TRUST OF PERSONALTY MAY BE CREATED BY PAROL.
   A trust of personal property may be created by parol.[1]

2. SAME — MAY BE INFERRED — NO PARTICULAR FORM OF WORDS
   NECESSARY.
   A trust may be inferred from the facts and circumstances
   of a particular case, and its creation does not depend upon
   the use of a particular form of words.[2]

3. SAME—AGREEMENT CREATING TRUST ESTABLISHED.
   An agreement between a husband and wife that the sur-
   vivor should have the use of the other's property for life,
   and that then it should go to the other's heirs, *held*, es-
   tablished by the record.[3]

4. SAME—TRUST AGREEMENT NOT NEGATIVED BY HUSBAND'S WILL.
   Husband's will leaving all of his property to his wife,
   *held*, not to negative a previous agreement they had made
   that the survivor should have the use of the other's
   property for life, and then leave it to the other's heirs,
   especially in view of the fact that the wife made a will
   contemporaneous with that of her husband, which she
   withdrew after his death.[4]

5. SAME—NATURE AND AMOUNT MUST BE CERTAIN.
   An essential in the creation of a trust is that the nature
   and amount of the beneficiary's interest must be made
   certain.[5]

6. SAME—AMOUNT OF TRUST ESTATE.
   The claim that the trust impressed upon the wife's estate
   was one-half of the personal property left by her is not
   established by the record, which shows that it was to
   be the amount of his property which she received.[6]

7. SAME—TRUST IMPRESSED TO AMOUNT MADE CERTAIN BY PROOF.
   Although the amount of the husband's property which the
   wife received is uncertain, a trust is imposed upon her

[1]Trusts, 39 Cyc. p. 51; [2]Id., 39 Cyc. p. 57; [3]Id., 39 Cyc. p. 85;
[4]Id., 39 Cyc. p. 93; [5]Id., 39 Cyc. p. 60; [6]Id., 39 Cyc. p. 639.
   On sufficiency of declaration to establish voluntary trust where
legal title is retained in settlor, see note in 12 L. R. A. (N. S.) 547.

estate to the amount made certain by proof of the assignment by him to her of certain mortgages in pursuance of their agreement.[7]

8. SAME—WHEN CREATED.

A person need use no particular form of words to create a trust or to make himself a trustee, it being enough if, having the property, he conveys it to another in trust, or, if personal property, if he unequivocally declares, either orally or in writing, that he holds it *in præsenti* in trust or as trustee for another.[8]

Appeal from Lenawee; Root (Jesse H.), J., presiding. Submitted October 15, 1924. (Docket No. 97.) Decided July 16, 1925.

Bill by Margaret Faulds and another against Percy J. Dillon, executor of the last will of Emma McKellar, deceased, and others to impress a trust. From a decree dismissing the bill, plaintiffs appeal. Reversed, and decree entered for plaintiffs.

*J. N. Sampson* and *M. E. Tripp*, for plaintiffs.

*B. D. Chandler* and *Baldwin & Alexander*, for defendants.

STEERE, J.    Defendant Percy J. Dillon is executor of the last will and testament of Emma McKellar who resided at Hudson, Lenawee county, Michigan, at the time of her death on February 23, 1923.    Her will is dated October 14, 1921, and was duly admitted to probate in the probate court of Lenawee county on June 4, 1923.    By it testatrix left a house and lot in Hudson and one-half of her personal property to her three sisters; and the remaining one-half of her personal property to her sister-in-law, Carrie Campbell.    Dillon was named as executor in her will.    The personal property which she left consisted mostly of securities valued at between $35,000 and $40,000.

[7]Trusts, 39 Cyc. p. 639; [8]Id., 39 Cyc. pp. 57, 66.

The executor's bond was fixed by the court at $30,000. Plaintiffs Margaret Faulds of Bay City and Carrie Bowen of Port Huron, Michigan, together with Adah Williams of London, Ontario, are the surviving heirs-at-law of Dr. Duncan McKellar, former husband of said Emma McKellar.     He died at Hillsdale, Michigan, on July 7, 1917.     Defendants John and Mason Bryant, Mary Tuttle and Norton Bryant are respectively brothers, sister and nephew of Emma McKellar and intervening defendants.     While said estate was in process of administration and before it had been distributed, plaintiffs filed this bill alleging that by agreement between Dr. McKellar and his wife, Emma, one-half of said personal estate left by her was a "trust fund in the hands of said executor for the benefit of the legal heirs of said Duncan McKellar, deceased," the relief asked being:

"That this honorable court shall decree the one-half of said estate to be a trust fund in the hands of said executor for the benefit of the legal heirs of the said Duncan McKellar, deceased.

"And that the said Percy J. Dillon, said defendant, may be compelled, by the decree of this honorable court, specifically to perform the said agreement between the said Duncan McKellar and Emma McKellar, both deceased, and pay to the plaintiffs and Adah Williams, or their legal representatives, the one-half of said estate now pending in the probate court of said county.

"And that the said Percy J. Dillon, as executor, be restrained by an order of this court from distributing or paying out to the heirs of the said Emma McKellar, deceased, the one-half of said estate, until the further order of this court."

Defendants pleaded issuably in denial.     The case was duly heard on pleadings and proofs and taken under advisement by the court.     An opinion was thereafter rendered in which the court held plaintiffs had failed to sustain the allegations of their bill by

a preponderance of convincing proof, and a decree dismissing the bill was filed August 7, 1924, from which plaintiffs have appealed.

It was shown that Dr. McKellar practiced his profession in Hillsdale for over 30 years, just how long does not appear. The record does not disclose his or his wife's age at the time of their deaths or marriage. They were married in 1904. They were then well along in years and each possessed of some means, but how much either then had is not disclosed. They lived in Osseo, Hillsdale county, for a time after their marriage and then moved to the city of Hillsdale where they were living in a home of their own held in their joint names as tenants by entirety at the time of his death in 1917. Soon after his death she moved to Hudson where she had relatives and made her home there until her death between five and six years later. The testimony indicates that their marriage relations were pleasant and their home life congenial. They were understood to be well off and each possessed of independent means, but the statement in plaintiffs' brief that "each had about the same amount of personal property" is apparently based on inference. That the doctor was solicitous of his wife's welfare and desired that she should have available for her own use and benefit whatever he left in case she survived him is fairly shown, but just how much he did have or leave does not clearly appear. He apparently gave to her before he died or left to her by will all he had. There is no written evidence that any of it was impressed by a trust. Plaintiffs' theory is that there was an oral trust by agreement, stated as follows:

"No children were born as a result of said marriage. They each had about the same amount of personal property, and entered into an agreement to pool their personal property and fix it so that the survivor could have the use of the whole of their collective property

as long as he or she might live, and at the death of the survivor of them one-half of their personal property should go to the heirs of Duncan McKellar, and one-half to the heirs of Emma McKellar."

Whatever may have been previously talked, precatory or otherwise, the first definite move the doctor actually made directed to a disposition of his property in anticipation of death was in the winter of 1915 after he had become crippled by the loss of his foot. That is shown by the testimony of plaintiffs' first witness, Mrs. Blanche Wolcott, and some 10 assignments of mortgages by him to his wife which Mrs. Wolcott drew up. She was an old acquaintance of the McKellars and an occasional visitor at their house. She had worked in the register of deeds' office and at abstracting for some years. The doctor had been her family physician and she had drawn up some papers for him at different times and thought she did most of their conveyancing after 1913. She stated that she was called there at one time in the fall or winter of 1915 to make a lot of assignments. Of this transaction she testified in part:

"I said, 'If you will state what you want, we will go at it.' We had, previous to this, talked of the disposition of the property, and he says, Dr. McKellar spoke and says, 'Well, I want to remember Emma first,' or 'look out for Em. first.' He made the remark in that substance. I told him various ways in which he could dispose of his property. * * *

"Q. Did he say about anything going to his relatives?

"A. I think so. I told him he could have it transferred to some disinterested party and then have it come back to them in joint title, if he wished it in that way. 'Well,' he says, 'I will look out for Em. first.' He said 'Em. and I have an understanding and I will look out for Em. first.' He might have said 'agreement.' As I remember he said, 'Em. and I have an understanding about our property and I want to look

231—Mich.—33.

out for her first.' He did not tell me what the understanding was, I never asked him. I proceeded to make an assignment of his mortgages and notes and bonds. I assigned them to Emma McKellar. I also made some papers from her to him. There were quite a few to make from her to him, I could not remember positively what they were." * * *

### Cross-Examination.

"*Q.* And you remember of drawing assignments of mortgages from her to him?

"*A.* I drew quite a good many papers, of course, I have no way of remembering those now. I think I drew assignments from her to him. That is my recollection.

"*Q.* Are you sure about that?

"*A.* I say that is my recollection."

### Redirect.

"But, as I remember it now, he says, 'Em. and I have an understanding about our property.'

"*Q.* Is that your best recollection of his words?

"*A.* Yes, that is my best recollection. He might have said 'Em. and I have an agreement.' He conveyed the idea to me that there was something."

If they had agreed to pool their personal property and impress it with a trust, and called in Mrs. Wolcott "to draw the necessary papers to carry out their agreement," as plaintiffs' counsel claim, her and their efforts to that end as she relates them consisted of some assignments from the doctor to his wife of securities and some assignments from her to him in connection with which he stated there was an understanding between him and his wife about their property, or conveyed to the scrivener an idea "that there was something," and he would "look out for Em. first," which he apparently did by assigning to her about $10,000 worth of mortgages with no suggestion of a trust or any other conditions. Her testimony indicates that she drew up other assignments from the doctor to his wife and "quite a few" from his wife to him but leaves to conjecture their nature and value.

Whatever the reason, the next move by Dr. McKellar and his wife for disposition of their property in anticipation of death was by wills which Mrs. Wolcott testified she did not draw and had never seen, but was told of them by Mrs. McKellar, who did not tell their contents but said that there were other matters besides the assignments which they wanted to look after "and for that reason they had made their wills."

On July 10, 1916, Mrs. McKellar deposited with the probate judge of Hillsdale county for safe keeping two wills, one made by herself and the other by Dr. McKellar.    Both remained on deposit in the probate office until after the doctor's death, about a year later.    Soon thereafter she withdrew her will, on July 24, 1917, while his remained in the probate office and was later admitted to probate.    It is dated July 10, 1916, and, omitting formal parts, reads as follows:

"Bearing in mind that my good · wife, Emma McKellar, has faithfully assisted me in the accumulation of my property and in ministering to me during sickness and affliction, as well as in time of health, I hereby give, devise and bequeath to her all my property, both real and personal wheresoever situate, of which I may die seized and possessed."

On November 13, 1918, Mrs. McKellar petitioned the probate court of Hillsdale county for admission of her husband's will to probate, giving in her petition the estimated value of decedent's estate as:    "Real estate $__no__ or thereabout; personal estate, $200.00 or thereabout, as I am informed and believe."    Also stating that "the names, relationship, ages and residences of devisees, legatees and heirs-at-law of said deceased are as follows:

"Your petitioner, widow, Hillsdale.    Carrie Campbell, sister, London, Canada.    Margaret Faulds, sister, Saginaw, Michigan.    Addie Stevens, niece, child of Addie Stevens, a deceased sister, Port Huron, Mich. All of legal age."

She on the same date filed a petition that she be appointed special administrator of said estate to collect and pay over to Addie Stevens the sum of $200 which deceased had deposited in a bank as trustee for her.    This petition was granted on the same day, she being appointed special administrator on furnishing an approved bond in the sum of $400, which she did.    On December 6, 1918, an order was made, after due notice and hearing admitting the doctor's will to probate and appointing his wife, Emma, administratrix.    No further proceedings in the probate court are shown to have been taken in relation to his estate.

It is conceded that a trust of personal property may be created by parol.

"A trust may frequently be inferred from the facts and circumstances of a particular case, and its creation does not depend upon the use of a particular form of words."    (Quoting from the syllabus.)    *Chadwick* v. *Chadwick*, 59 Mich. 87.

Of the essentials of a declaration of trust it is said in 26 R. C. L. pp. 1182, 1183:

"The owner and donor of personal property may create a perfect or complete trust, by his unequivocal declaration in writing, or by parol, that he himself holds such property in trust for the purposes named. * * * There is no prescribed form for the declaration of a trust; whatever evinces the intention of the party that the property of which he is the legal owner shall beneficially be another's is sufficient. The intention must be plainly manifest, and not derived from loose and equivocal expressions of parties, made at different times and upon different occasions; but any words which indicate with sufficient certainty a purpose to create a trust will be effective in so doing. It is not necessary that the terms 'trust' and 'trustee' should be used.    The donor need not say in so many words, 'I declare myself a trustee,' but he must do something which is equivalent to it, and use expressions which have that meaning."

In support of their contention that there was an agreement between the doctor and his wife impressing their holdings with a trust plaintiffs not only rely on the circumstances related by Mrs. Wolcott and shown by the records, but confirmatory testimony of other witnesses.   Minnie L. Russell, who was probate clerk of Hillsdale county for many years, testified she lived the third house from the McKellars in Hillsdale, was well acquainted with them and neighborly.   The doctor used to come to the office occasionally and she remembered drawing a deed for him at one time in which he conveyed a farm in northern Michigan to a sister and nephew whom he said were needy.   She thought him a good business man, bright mentally, remaining so until his death which was very sudden. She saw him two or three days before he died "and he was as bright as ever."   Soon after he died Mrs. McKellar moved to Hudson and occasionally visited Hillsdale.   On several occasions she visited witness at the office for a short time.   She would come up in the morning and wanted to go back at noon.   On two different visits she said in substance:

" 'Well, I can't stay any longer.   I must go down and see about that will I promised to make.   *   *   * I must go and make the will I promised the doctor I would make.'   She said it twice and I think I have it pretty straight."

Mr. Marion Lagassee, who with his wife lived next door neighbor to the McKellars from 1911 until the doctor died, testified they were on friendly terms most of the time and saw a great deal of them.   He frequently visited them, though not as often as his wife.   In conversations at their home regarding his property the doctor said:

"He was to leave it to Mrs. McKellar, who was to have the use of it as long as she lived, and then it was to go to his heirs.   He told me that on different occasions.

"*Q.* Did Mrs. McKellar tell you what was to be done with her property?

"*A.* Why, she said it would be the same as the doctor's, that they had an agreement to that effect. That he was to have the use of her property if he outlived her, then it was to go to her heirs. * * * After he died Mrs. McKellar said that was the agreement, too. * * * It was a few days after he died, or after the will was read, she was at our home, I remember, and she said the doctor had left her his estate, but she had to return it to his heirs."

Mrs. Neva Lagassee, wife of Marion, testified that their houses were practically on the same lot, she knew the McKellars well, was in their home a great deal and at times helped take care of the doctor after he became afflicted.    He liked to talk, "figured he was a self-made man, had acquired his own money and she had her own."    She had frequently heard him tell that his property was to revert to his side of the family.

"Mrs. McKellar was to have the use of it if she survived him and the other way round if he survived her. * * * That was the talk from both of them, whichever survived was to have the use of the property of the other. * * * It was arranged that way. They had it definitely arranged. * * *

"*Q.* What did they say?

"*A.* 'Well,' doctor said, 'If I die first Em. is to have my property as long as she lives, and the use of it, then it is to go to my people because I had my property before I married her and she had hers before she married me.'

"*Q.* Was she present when he said that?

"*A.* Always.    They were always together.

"*Q.* What did she say about her property?

"*A.* The same thing.

"*Q.* Well, what?

"*A.* Well, in the same way.    She said: 'If I go first, doctor is to have the use of my property as long as he lives, and it is then to go to my people.'

"*Q.* When was this that you heard this talk?

"*A.* All those years that I lived there. * * * Upon frequent occasions he told me they had an arrangement between themselves whereby the property

was to go as he had told me.   This continued right along.    I went there all the time of his life after he moved there."

The testimony does not indicate that either the doctor or his wife had any particular friendship with or interest in the other's relatives.   So far as shown his relatives lived in the north or in Canada.   She had relatives at Hudson, where she spent the rest of her life after he died.   He was shown to have helped some of his relatives when needy and to have once said to a niece in his wife's presence when talking about money, "Well, some day I will give you all property."

Aside from the one niece who once visited them, the record does not disclose that Mrs. McKellar was acquainted with any of the doctor's relatives.   When she applied for probation of his will shortly after he died she named as his natural heirs two sisters and a niece.   That she was mindful of their agreement, desired to observe it, and lamely attempted to do so is fairly indicated.   She twice told Minnie Russell on her hurried visits to Hillsdale that she must "see about" or "go and make" her will as she had promised the doctor, and she did make two wills, the oldest in 1920, which was denied probate because not executed in compliance with statutory requirements.   In it she attempted to leave half of her personal property to her husband's "three sisters," two of whose names she had apparently forgotten, stated in the will to be "as follows: Mrs. Carrie Campbell, London, Canada, Mrs. Addie _____, Mrs. _____."
In her last will, made over a year later, she yet remembered she had a "sister-in-law, Carrie Campbell," to whom she attempted to leave half of her personal property, but whose death preceded hers, resulting in the doctor's entire estate going to her heirs instead of his, if not impressed with a trust, as she herself had declared after his death was the condition under

which he left it to her.    Her notion or knowledge of who were his heirs seemed to have been hazy.    Mrs. Wolcott, who was an old friend of both and knew them well, testified to a marked difference in their mental attainments.    She "could not say Mrs. McKellar was not a bright woman," but she was uneducated, "had no business ability whatever about her  *  *  *  did not have any education to any extent.    She could write her name.    She never wrote me a letter, but I had written letters for her to other people."

In the findings of the trial court it is said:    "That there was an 'understanding' between the parties the court has not the slightest doubt," but the court was of the opinion "there is no clear proof that the understanding was to leave one-half of the property to all of Duncan's heirs," and the fact that Mrs. McKellar did leave one-half of the property to a sister justified the inference "that she was honestly attempting to carry out the 'understanding' existing between her and her husband."

Aside from the fact that Mrs. McKellar twice ineffectually tried to will one-half of her personal property to one or more of the doctor's heirs, we find no evidence, direct or inferential, that they owned an equal amount of property or that what the survivor left should be equally divided between his and her heirs.    Neither do we find any testimony that Mrs. Campbell was ever mentioned by them in connection with their property, or otherwise, during his life.    As we read this record there is not only convincing evidence that there was an understanding as to their property, but also clear and undisputed testimony by apparently reputable and disinterested witnesses that the "understanding" or "agreement," as directly declared more than once by the doctor and his wife to others and in the presence of each other, was that the survivor should have the use of the other's property during the remainder of his or her life and then

leave it to the other's "heirs" or "people;" and this was reaffirmed by her after his death when she said he had left her his estate, "but she had to return it to his heirs."

The claim is made that the doctor's will leaving all his property to his wife negatives any previous agreement they may have made relative to his property, and to sustain the trust necessitates setting aside his will. That will was contemporaneous with one made by Mrs. McKellar, both being filed by her in the probate office for safe keeping. Before the doctor's death she told Mrs. Wolcott, who had drawn up the assignments, of their having made wills and told her there were other matters they wanted to look after which the assignments had not provided for "and for that reason they had made their wills." After his death she withdrew her will and what matters it contained which assignments had not provided for are not disclosed. But when his will was filed for probate the only matter she claimed was controlled or affected by it was a $200 fund deposited by him in trust for Addie Stevens. She stated under oath in her petition that he left no other estate, and made no other or further claim under his will.

Neither side questions the truthfulness or honesty of Mrs. McKellar. What she said and did after her husband's death shows that she consistently recognized the agreement between them and is persuasive that she only failed in her efforts to fulfill her obligations through total lack of business ability, and ignorance of the proper course to pursue.

It is further insisted for the defense that the agreement as claimed cannot be enforced because the amount of his property is not shown and there is no proof of the sum which should go to the doctor's heirs, while it is urged for plaintiffs that Mrs. McKellar conceded by the wills which she made that it was one-half of the personal estate she left. That may have been

her inference, but the agreement on which plaintiffs' claim of trust is based does not so show. It was "his property," "his estate" which she was to have the use of during her life, and then go to "his heirs." An essential in the creation of a trust is the nature and amount, or amount of the beneficiaries' interest, must be made certain. Whatever property the doctor may have given to his wife for life use and then to go to his heirs, the only amount made certain is the about $10,000 in mortgages assigned to her in pursuance of their understanding as to their property. Whatever other assets he may have assigned to her or she to him, their nature and amount are left in conjecture.

Limited by such uncertainties to the assigned mortgages we are of opinion that it is convincingly shown both by explicit declarations and supporting circumstances that the doctor entrusted his property to his wife for her life use and thereafter to go to his heirs, thereby creating a trust, which she accepted, and thereby impressed such trust upon the estate she left to the amount so definitely shown, under the following general rule stated in *Ray* v. *Simmons,* 11 R. I. 266 (23 Am. Rep. 447), and quoted with approval in *Hamilton* v. *Hall's Estate,* 111 Mich. 291:

"A person need use no particular form of words to create a trust or to make himself a trustee. It is enough if, having the property, he conveys it to another in trust, or (the property being personal) if he unequivocally declares, either orally or in writing, that he holds it *in præsenti* in trust or as a trustee for another."

The decree of the lower court will be set aside and a decree may be entered in accordance with this opinion, with costs to plaintiffs.

McDONALD, C. J., and CLARK, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred. BIRD, J., did not sit.