CHILDREN OF THE CHIPPEWA, OTTAWA AND POTAWATOMY
TRIBES v THE REGENTS OF THE UNIVERSITY OF MICHIGAN

Docket No. 44533. Submitted June 12, 1980, at Lansing.—Decided
    January 26, 1981.

    Plaintiffs, a class known as the Children of the Chippewa, Ottawa
    and Potawatomy Tribes, and Paul J. Johnson, a member of the
    class, brought an action in Washtenaw Circuit Court against
    The Regents of the University of Michigan seeking to have a
    trust declared in favor of the plaintiffs based upon the provi-
    sions of the 1817 Treaty of Fort Meigs. Plaintiffs claimed that
    the treaty created a trust whereby certain land belonging to
    the Indians was conveyed to the defendant for purposes of
    ensuring that the Indians and their descendants would receive
    an education, and a variety of equitable remedies were sought.
    The circuit court, Edward D. Deake, J., found that no trust,
    either express or constructive, was created and entered a
    judgment of no cause of action in favor of defendant. Plaintiffs
    appeal. *Held:*

        1. The trial court correctly found that at the time of the
    treaty the Indians held only a right of possession of lands
    occupied by them. Title in fee simple was in the United States
    government.

        2. The trial court properly considered the theories set forth
    in both the initial complaint and the plaintiffs' amended com-
    plaint.

        3. The treaty provision in question constituted a gift of the
    subject lands. In addition, the treaty was not the sole product

REFERENCES FOR POINTS IN HEADNOTES
[1] 4 Am Jur 2d, Appeal and Error § 76.
    5 Am Jur 2d, Appeal and Error § 839 *et seq.*
    Formal requirements of judgments or orders as regards appealabil-
    ity. 73 ALR2d 250.
[2] 41 Am Jur 2d, Indians §§ 23-28.
[3] 38 Am Jur 2d, Gifts §§ 7, 8.
[4] 76 Am Jur 2d, Trusts §§ 15, 34, 35, 38.
[5] 76 Am Jur 2d, Trusts §§ 44, 46.
[6] 76 Am Jur 2d, Trusts § 221 *et seq.*

of the efforts of Lewis Cass, the then-president of the newly-created university.

4. The treaty did not create an express trust in favor of the Indians.

5. The trial court properly refused to impose a constructive trust. The imposition of a constructive trust in this case is neither equitably nor legally desirable.

Affirmed.

1. APPEAL — EQUITY — FINDINGS OF FACT.

The Court of Appeals may not reverse or modify a factual decision reached by a trial court in an equity matter unless the Court of Appeals is convinced that it would have reached a different result had it occupied the position of the trial court.

2. INDIANS — REAL PROPERTY — TITLE IN PROPERTY — RIGHT OF POSSESSION — STATUTES.

Federal law creates a right of occupancy in the Indians, rather than a title in fee simple, as to lands held by them; the Federal government possesses power to convey the fee to lands occupied by Indian tribes, and all questions with respect to rights of occupancy and conditions of extinguishment of Indian title are solely for the Federal government (25 USC 177).

3. GIFTS — INTER VIVOS GIFTS.

A valid gift inter vivos requires that there be a delivery, actual or symbolic, of the subject matter, unless it is already in the possession of the donee, with an intent on the part of the donor to divest himself of all title and dominion over the subject matter, and an acceptance by the donee.

4. TRUSTS — CREATION OF TRUST.

A trust is created only if the settlor manifests an intent to create a trust and there is an explicit declaration of trust accompanied by a transfer of property to one for the benefit of another.

5. TRUSTS — EXPRESS TRUSTS — REAL PROPERTY.

An express trust in real property must be in writing, under the hand of the one to be charged.

6. TRUSTS — CONSTRUCTIVE TRUSTS — EQUITY.

Constructive trusts are creatures of equity and their imposition makes the holder of the legal title the trustee for the benefit of another who in good conscience is entitled to the beneficial interest; they are imposed only where it would be inequitable to do otherwise.

*Elmer E. White,* for plaintiffs.

*Roderick K. Daane,* for defendant.

Before: T. M. BURNS, P.J., and BEASLEY and G. R. DENEWETH,* JJ.

PER CURIAM. On September 29, 1817, the Treaty of Fort Meigs, 7 Stat 160, was executed. The Chippewa, Ottawa and Potawatomy Indian Tribes were signatories of the first part and the government of the United States of America was the signatory of the second part. The treaty was drafted entirely by the representative of the United States. The defendant at bar was not a party to the treaty.

Notwithstanding this latter fact, the plaintiffs, who are descendants of the members of the signatory Indian tribes, brought an action in equity before the Circuit Court of Washtenaw County seeking to have a trust declared in their favor against defendant based on the provisions of this treaty.

The original complaint was filed August 5, 1971. It was claimed that Article 16 of the treaty created a trust whereby certain land, belonging to the Indians, was conveyed to defendant for purposes of ensuring that the Indians and their descendants would receive an education in the European fashion. In support of this contention, the complaint cited certain alleged historical events, including the vesting of the title of the conveyed parcels of land in the defendant; the then-university president Lewis Cass's appointment of two trustees to locate and survey these lands; the patenting of these lands to defendant by the government of the

---

* Circuit judge, sitting on the Court of Appeals by assignment.

United States in 1824; and the release by one Church of St. Anne of its interest of the lands in favor of the defendant.

The inclusion of St. Anne's Church in the complaint was occasioned by the plaintiff's assertion that the treaty compelled the church to provide for the primary and secondary education of the Indians. The complaint then contends that the treaty imposed a concomitant duty upon defendant to ensure the Indians' college education. It is then claimed that the aforementioned conveyance by the church to the defendant merged the foregoing duties wholly into defendant's realm of responsibility.

The complaint then charged that a breach of these duties had occurred and was continuing to occur. To remedy the alleged breach, plaintiffs proposed a broad spectrum of equitable remedies.

An accounting of the proceeds realized from sale of the subject parcels was sought. Plaintiffs proposed that upon completion of this accounting a trust fund composed of proceeds from these sales should be established. Another trust fund, to be composed of monies accounted for from the sale of lands conveyed to defendant from St. Anne's Church, was also sought.

In addition to the foregoing, plaintiffs asked for an accounting of all the investments in both trust, or, in the alternative, payment of a 15% interest fee thereon to be compounded annually from 1826 forward.

The complaint then went on to ask for an accounting of all lands received from the Indians which had not yet been sold together with an accounting of the accrued rent thereon to be computed annually with a compound rate of 15% interest to be added thereto.

It was finally requested that the circuit court should replace defendant as the trustee of these funds with a person of its own choosing and that the proceeds from the first trust fund should be directed toward providing plaintiffs with monies to continue their education at any collegiate institution of their choosing. The funds from the second trust were to be applied toward the primary and secondary education of the plaintiffs.

On March 28, 1977, plaintiffs filed an amended complaint and presented a two-pronged attack, again under a theory of equitable trust. After noting the 1974 decision of the trial court to treat the matter as a class action, plaintiffs proceeded to proffer a claim that the treaty had created an express trust with the plaintiffs being the beneficiaries of that trust. The amended complaint went on to assert that defendant had sold the lands conveyed to it under the treaty without either dedicating the monies realized from the sales to the plaintiffs' educational needs or in any other way accounting to the plaintiffs for these proceeds. The amended complaint then sought a trial under the theories of express and/or constructive trust and otherwise repeated the earlier claims.

The treaty provision that is the primary focus of the present dispute, Article 16, reads:

"Some of the Ottawa, Chippewa, and Potawatomy Tribes, being attached to the Catholick religion, and believing they may wish some of their children hereafter educated, do.grant to the rector of the Catholick church of St. Anne of Detroit, for the use of the said church, and to the corporation of the college at Detroit, for the use of the said college, to be retained or sold, as the said rector and corporation may judge expedient, each, one half of three sections of land, to contain six hundred and forty acres, on the river Raisin, at a place called Macon, and three sections of land not yet located,

which tracts were reserved, for the use of the said Indians, by the treaty of Detroit, in one thousand eight hundred and seven; and the superintendent of Indian affairs, in the territory of Michigan, is authorized, on the part of the said Indians, to select the said tracts of land."

Trial commenced August 21, 1978. During the trial, numerous exhibits were received along with much expert testimony from all sides. On February 28, 1979, the trial judge issued a meticulously researched and well-drafted written opinion, thoroughly discussing the historical and procedural facets of this novel action and carefully setting forth that law which he believed controlling of this case. The opinion denied relief on all counts.

We have painstakingly reviewed the findings of fact in that opinion and agree with the trial judge in respect to those findings. The task of leaping back over 160 years in time is most difficult and the trial judge is to be commended for his efforts in that regard. Our decision in this area is further militated by the case of *Ford v Howard,* 59 Mich App 548; 229 NW2d 841 (1975), as the same is cited in *Telegraph-Lone Pine Venture Co v Bloomfield Twp,* 85 Mich App 560, 563; 272 NW2d 136 (1978). Both cases hold that we may not reverse or modify a factual decision reached in an equity matter unless we are convinced that we would have reached a different result had we occupied the position of the trial court. The trial court had the superior opportunity to see and hear the witnesses' testimony and to evaluate their respective credibility. We are not convinced that a different conclusion in regard to the facts was possible.

To recapitulate each of these findings of fact would be an exercise in expatiation. Rather, in setting forth the findings of fact, we choose to

incorporate the entire opinion of the trial court as part of this opinion to accomplish that end. See the Appendix to this opinion.

Following the issuance of the opinion of February 28, 1979, the present appeal was brought as of right. Five issues are raised by plaintiffs.

It is first asserted that the trial judge erred in finding that the Indians could not have owned fee simple title to any lands conveyed from the year 1790 forward. In so ruling the trial court found *Oneida Indian Nation v County of Oneida,* 414 US 661; 94 S Ct 772; 39 L Ed 2d 73 (1974), to be dispositive. We agree. The thrust of *Oneida* is that the 1790 Nonintercourse Act[1] created a right of occupancy rather than a title in fee simple in the Indians as to lands held by them. The trial court held that the Federal government possesses power to convey the fee to lands occupied by Indian tribes and all questions with respect to rights of occupancy and conditions of extinguishment of Indian title are solely for the Federal government. The trial court went on to say:

"This Court will concede that in 1817 the Indians could have imposed an express trust on the lands possessed by them and granted to the Church and College by the 1817 Treaty but this was simply not done at that time."

Given this recognition by the trial court, it is difficult to understand the plaintiffs' cavil on the issue. The trial court's ultimate decision obviates further discussion in any event.

Plaintiffs assert that the trial court erred in relying upon the theories set ·forth in the first complaint as a point of reference for its opinion.

[1] Stat 137, now 25 USC 177.

While it is true that the opinion of February 28, 1979, assumes the claims of the earlier complaint in reference to grants of land, the error is not fatal. A fair reading of the opinion discloses that both theories of recovery in the second complaint were extensively discussed and refuted. The trial judge clearly comprehended the basis of the relief sought in the second complaint and carefully interwove those theories with the evidence adduced before ruling against them.

Plaintiffs' citation of *Snyder v United Benefit Life Ins Co,* 371 Mich 36; 123 NW2d 234 (1963), as authority for a reversal on this issue is misplaced. *Snyder* is legally and factually inapplicable, involving, as it does, questions concerning jury instructions, a factor not present in the matter at bar.

This claim of error falls squarely under the purview of GCR 1963, 517.1, which requires that findings of fact and conclusions of law be articulated in a manner which will facilitate appellate review. Judge Deake fulfilled that duty admirably.

A third issue raised by plaintiffs is whether the trial court was justified in holding that Article 16 of the Treaty of Fort Meigs constituted a gift of lands to Father Richard and to defendant. We believe that it did.

A valid gift inter vivos requires that:

"There must be a delivery, actual or symbolical, of the subject-matter, unless it is already in the possession of the donee, with an intent on the part of the donor to presently divest himself of all title and dominion over the same, and an acceptance by the donee." *Chamberlain v Eddy,* 154 Mich 593, 603; 118 NW 499 (1908), *cf. Osius v Dingell,* 375 Mich 605, 611; 134 NW2d 657 (1965).

The operative language in Article 16 provides that some of the plaintiff's forefathers:

> "*do grant* to the * * * church * * * for the use of the said church, and to the * * * college * * * for the use of the said college, *to be retained or sold, as the said rector and corporation may judge expedient,* each, * * *." (Emphasis added.)

Clearly, the grant itself is a completed one and not conditional in nature. Nor do its terms encompass more than one transaction. The land is donated jointly to the church and to the corporation. The later division of the parcels was a consequence of Father Richard's discretion, a discretion Article 16 allowed him to exercise.

The evidence points to an almost reverential attitude toward Father Richard on the Indians' part. This attitude was commingled with an attitude of filial affection. The evidence also points to a clear donative intent on the Indians' part as regards Father Richard and encompasses a similar attitude toward the educational institution which the Indians very properly regarded as an extension of Father Richard's personality and influence.

We disagree with plaintiffs' continued assertions that the treaty, and particularly Article 16, were the sole product of Lewis Cass's efforts. The evidence does not support such a contention in any way. Rather, the treaty was the cumulative result of extended negotiation involving many leaders on both sides.

Both the expert testimony and the language of the treaty itself reflect the likelihood of a present donative intent on the part of the Indians at the time of the treaty's execution. Judge Deake's ruling on the question is carefully reasoned and set forth. We find no basis for any conviction that a

mistake was committed. *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976).

The next claim of error challenges the trial court's decision that Article 16 created no express trust in the Indians' favor.

"It is a general principle of trust law that a trust is created only if the settlor manifests an intention to create a trust, and it is essential that there be an explicit declaration of trust accompanied by a transfer of property to one for the benefit of another." *Osius, supra,* 613.

Further, an express trust in real property must be in writing, under the hand of the party to be charged. *Howe v Webert,* 332 Mich 84, 93-94; 50 NW2d 725 (1952).

We find that the plaintiffs' substantive arguments in support of the theory of an express trust are based on speculation and irrelevancy.

The last claim on appeal concerns the issue of a constructive trust. The trial court rejected this theory for several reasons: (1) the university was not a party to the negotiations and committed no misconduct in the treaty negotiations; (2) the Indians were represented by competent interpreters and a trusted Indian agent; (3) the United States evidenced no unjust conduct at the negotiations, its main intent being to secure a cession of a significant area in Ohio; (4) the Article 16 land was of minimal value when conveyed and when the university tried to sell it; and (5) the two cases cited by plaintiffs are distinguishable. We agree.

In the recent case of *Arndt v Vos,* 83 Mich App 484, 487; 268 NW2d 693 (1978), it is stated that:

"Constructive trusts are creatures of equity and their imposition makes the holder of the legal title the

trustee for the benefit of another who in good conscience is entitled to the beneficial interest. They are distinguished from express and resulting trusts in that they do not arise by virtue of agreement or intention, but by operation of law. Constructive trusts, while infinite in their variety, are imposed only where it would be inequitable to do otherwise." (Citations omitted.)

Clearly, if fraud or other misconduct is the sole determinant, the trial court did not err in refusing to impose a constructive trust. Defendant was not a party to the treaty or represented at the negotiations. Cass was present as a treaty commissioner, representing the United States. We repeat that there is no evidence at all that he instigated the Article 16 conveyance or that he succeeded in rewriting a provision which otherwise would clearly have manifested an express trust, or that he even drafted Article 16 as it is written. Moreover, there is no claim of malfeasance on defendant's part.

The second definition of constructive trusts, requiring that they should be imposed where it would be inequitable to do otherwise, regardless of fraud, does not redound to plaintiffs' benefit.

In a pristinely humane world, it might be honorable and fair to compel defendant to offer comprehensive scholarships in gratitude for the 1817 conveyance. Certainly, the cost of higher education is subject to the rigors of inflation as are all other things and the plaintiffs, like everyone else, could benefit by the financial assistance they seek. However, constructive trusts are not used to requite obligations imposed by conscience alone. Rather, they are imposed solely where a balancing of equities discloses that it would be unfair to act otherwise. Where, as here, the language of the

treaty and the historical evidence reflect a gift
inter vivos and nother more, the imposition of a
constructive trust is neither equitably nor legally
desirable.

Based on the foregoing, it is readily apparent
that the judgment of the trial court should be and
the same is hereby affirmed. No costs, questions of
novel impression and public significance being
involved.

Affirmed.

### APPENDIX

### STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WASHTENAW

CHILDREN OF THE CHIPPEWA, OTTAWA and
POTAWATOMY TRIBES and PAUL J. JOHNSON,

Plaintiffs

vs                                                    File No. 5915

REGENTS OF THE UNIVERSITY OF MICHIGAN, a
Constitutional Corporation,

Defendant

OPINION

At a session of said Court held in the
City of Ann Arbor, County of Washtenaw
State of Michigan, this 28th day of
February, 1979.

APPEARANCE: HONORABLE EDWARD
                D. DEAKE
                Circuit Judge

In this case a non-jury trial was held August 21,
1978, and lasted several days until the Court

heard closing arguments August 30, 1978 and reserved its decision. Excellent oral arguments were presented by able counsel and trial briefs were filed.

The trial was limited to the issues of express and constructive trust, and, if so, if later treaties abrogated any such rights. The complaint in this lengthy litigation was filed August 6, 1971. This action is a class action pursuant to the Court's Opinion dated July 26, 1974.

The Treaty of Fort Meigs was signed September 29, 1817 (more than 160 years ago between the Chippewa, Ottawa and Potawatomy Indian Tribes and the United States Government. The defendant University was not a party to the treaty. It was then known as the Catholepistemiad, or University of Michigania established by Territorial Law August 26, 1817 (about one month before the treaty).

Article 16 of the Treaty of Fort Meigs contained the following provision which is the main point of contention in this lawsuit:

"Some of the Ottawa, Chippewa, and Potawatomy tribes being attached to the Catholick religion, and believing they may wish some of their children hereafter educated, do grant to the rector of the Catholick church of St. Anne, of Detroit, for the use of the said church, and to the corporation of the college at Detroit for the use of the said college, to be retained or sold, as the rector and corporation may judge expedient, each one-half of three sections of land, to contain six hundred and forty acres, on the river Raisin, at a place called Macon, and three sections of land not yet located, which tracts were reserved for the use of the said Indians by the treaty of Detroit in one thousand eight hundred and seven; and the superintendent of Indian affairs in the territory of Michigan is authorized, on the part of said Indians, to select the said tracts of land."

It is plaintiffs' theory that Article 16 creates a trust for the education of Indian children of the three tribes. Plaintiffs request that defendant be required to render an accounting of the monies realized from the sale of all lands directly conveyed to defendant by plaintiffs' forefathers, that these monies be placed in a Trust Fund "A". Further plaintiffs request that defendant be required to render an accounting of the monies received from the sale of all lands released to it by the Church of Saint Anne, the same having been theretofore conveyed to said church in trust by plaintiffs' forefathers; that these monies be placed in Trust Fund "B". In addition, plaintiffs seek interest for these funds at a punitive compound rate to punish the defendant for its gross dereliction of trust. Further, plaintiffs seek an accounting for all lands not yet sold that were received directly from plaintiffs' forefathers. That upon any such lands that defendant may have erected buildings, defendant be required to pay a fair and reasonable rent to be computed annually with the compound rate of 15% interest added thereto since the date such building was erected. That these lands and rents be a part of Trust Fund "A". The same relief is requested of lands not sold that were received by defendant from the Church of Saint Anne. That these lands and rents be a part of Trust Fund "B". Other relief includes the ousting of the trustee and provision for college education, including post-graduate education to plaintiffs.

Defendant denies any trust, actual or constructive, and asserts that the lands in question were a gift to Father Richard. Further, that any rights created by the treaty of 1817 were abrogated by subsequent treaties, and further, that plaintiffs were guilty of laches in asserting this claim 150

years after the treaty was signed, having ignored earlier opportunities to do so.

This case has been an exceedingly complex and difficult case for the trial court because of the voluminous historical documents presented to the Court. The Court is asked to look back in history some 162 years and tell what happened at the 1817 treaty. This case is unusual insofar as most of the exhibits were stipulated to by counsel or unopposed by counsel. The evidence consisted of depositions of expert witnesses, testimony of expert witnesses and a great amount of historical documents. The Court was made aware of how historians research historical topics by going to primary sources and secondary sources. Primary sources would be a letter from the site, a journal or diary entry, something contemporaneous with the event. A secondary accounting is something that is reported later, *e.g.,* a biography written after the death of a person. (Deposition of Donald Chaput, Pl Ex E, pp 8, 9.)

The Court has examined this case from two perspectives: 1) the historical setting including the interactions of Father Gabriel Richard, General Lewis Cass, the Indian chiefs of the three tribes, and numerous other persons in this historical drama; and 2) a study of the language of the various treaties, statutes and patents. From either perspective this Court is unable to find a trust, actual or constructive. This has been a very difficult case to decide and this Court has spent considerable time reading voluminous exhibits and reviewing the testimony. This case is especially difficult because this Court has to leap backward in time some one hundred sixty-two years to figure what happened. The Court has been circumspect to protect the rights of both the affected Indian

tribes and the University of Michigan. As stated in its Opinion Denying Summary Judgment, "Courts are * * * admonished that in reading treaties the provisions therein should be liberally construed in favor of the Indians". *United States v Choctaw & Chickasaw Nations,* 179 US 494; 21 S Ct 149; 45 L Ed 291 (1900); *Northwestern Bands of Shoshone Indians v United States,* 324 US 335; 65 S Ct 690; 89 L Ed 985 (1944); *Pillager Bands of Chippewa Indians, Minnesota v United States,* 428 F2d 1274 (Ct Cl, 1970). Further, it should be noted that in a civil proceeding the burden of proof is on the plaintiff to prove its case by a preponderance of the evidence.

For a complete understanding of this case a review of the career of Father Gabriel Richard is in order. The Court finds from a review of the primary and secondary sources of history brought out at the trial that Father Richard was a trusted, respected friend and spiritual adviser to the Indian people and early French and American settlers. As early as 1799 he visited the Ottawas of Mackinaw. (Def Ex 3.) From 1799 to 1832, Father Richard was engaged in political, educational and welfare activities including Indian education. In October 1806, he petitioned the governor and judges for the gift of a corner lot on the military square in Detroit "for the purpose of erecting a college in which will be taught the languages ancient and modern, and several sciences". (Def Ex 1, Report of Dr. Tanner.) Dr. Tanner also concluded that Father Richard used the term "college" in the European sense to mean an academy or high school of the type he himself had attended in France. (Dr. Tanner's Report, p 40.)

Continuing with Father Richard's career, he operated the Spring Hill School from 1808-1811,

and enrolled as many as twelve (12) Indian students at a time. Spring Hill School was a disappointment to Father Richard because he failed to procure Federal funds necessary to save his lease at Spring Hill Farm. (Def Exs 2, 6; Pl Ex A.) Father Richard's missionary and educational efforts for the early settlers and the Indians endeared him to both. Even in the bitterness of the War of 1812 when a majority of the Indian tribes sided with the British, Father Gabriel Richard was loved by the Indians. In plaintiffs' Exhibit A at p 58, there is the account of Father Richard's liberation by the Shawnee Indian Chief Tecumseh. Chief Tecumseh truly hated the white man and was allied with the British during the War of 1812. He had hoped to create a great Indian nation in Michigan and Ohio as a reward for his efforts in that war. Father Gabriel Richard was temporarily imprisoned by the British because he failed to take the oath to His Britannic Majesty. Father Richard had taken the oath to the United States and was not about to take the oath again. Tecumseh threatened to leave the British service unless Father Richard was released. According to plaintiffs' witness, Donald C. Chaput, Tecumseh's treatment of Father Richard was an "indication that we are talking about an important, well-liked, trusted figure among the Indians on the Detroit River". (Deposition of Donald Charles Chaput, Pl Ex E, p 32.) Plaintiffs' Exhibit A was devoted to the history of Indian warfare in Michigan from 1812-1817. Both sides in this case agree that there was very little love lost between the Indians and the settlers during the period before and after the War of 1812. Plaintiffs argue that because of the hostilities between the Indians and settlers of the 1812 period, their ancestors could not have intended to make a gift to the American settlers in Article 16.

But because of the extreme high regard of the Indians for Father Richard even during this period of general hatred and when he had been captured by the British, it could be equally argued that the Indians would single him out for a gift of land.

This Court finds from a careful review of the testimony of all three expert witnesses, Dr. Tanner, Professor Dain and Donald Chaput, that the Indians loved Father Gabriel Richard and associated him with education. They would have been motivated to make a gift to projects with which Father Richard was associated. Plaintiffs argue that there was no donative intent in Article 16, and that if the Indians wanted to make a gift they would have used more specific language, *e.g.*, "in consideration of the good will, love and affection", as in the old deed to Grosse Ile in 1776. (Pl Ex P.) The lack of this language in Article 16 of the treaty does disturb the Court somewhat, but the Court must consider all of the evidence and the total circumstances in this case. Dr. Tanner, a defendant witness, testified, in her opinion, as a reasonable historical certainty that the purpose of Article 16 was to make a gift to the two projects with which the Indians knew Father Richard was actively concerned, the church and the college.

Plaintiffs' expert witness, Floyd Russell Dain, testified that the Indians wanted to help Father Richard. The witness testified about the purposes of the Article 16 grant. He continued that the Indians revered him and were grateful for the education received at Spring Hill's school. Professor Dain admitted that a possible construction of the treaty language was that it was motivated by Indian gratitude for Father Richard's care and kindness to them at Spring Hill's school, but he qualified by saying "[t]hat might be true if it were

not for the records of the Church of Saint Anne itself. But, why would they give it to a college?" (Deposition of Floyd Russell Dain, Pl Ex F, pp 120-121.) The records of the Church of Saint Anne are not in evidence here. It is clear to the Court that "college" here means a school such as Spring Hill's school rather than a large university in the modern context. Further Father Richard was so closely associated with the "college" that he in fact was the "college" in the minds of the Indians at that time. Professor Dain continued that the Indians granted these lands to Father Richard for two reasons. They were attached to the Catholic religion and they wanted Father Richard to continue to help their children. His school had gone out of business because of financial problems and here was a way of giving him support. (Dain Deposition, p 121.)

Another plaintiff witness, Donald C. Chaput, in answer to the question, "It is likely though, is it, that the Indians would have associated Father Richard with the college at Detroit though, is it not?" stated: "I find it hard to imagine anything else". (Deposition of Donald Charles Chaput, Pl Ex E, p 56.)

There is no doubt in the Court's mind that Father Richard was the Rector mentioned in the treaty. Witness Chaput added that he knew of no historian that ever entertained a thought that there was some other priest other than Gabriel Richard. In answer to the question why Father Richard was identified in Article 16, witness Donald Chaput stated:

"Well, there are two reasons and let me mention the first because I consider it least important and I'll get it out of the way. He had been actively discussing and actively participating in the foundation and the plan-

ning for this new kind of school in the territory of Michigan with various territorial officials."

The witness then continues with the history of Spring Hill School. (Deposition of Donald Chaput, p 29.) Professor Dain agrees with witness Chaput that the Indians saw an opportunity in Article 16 to assist Father Richard in his educational endeavors. (Deposition of Floyd Russell Dain, Pl Ex F, p 63, 11.15-23.)

It is not disputed that the Indians may have made a gift of the land at Macon because of their love for Father Richard. In Article 16, the language used by the Indian tribes made no distinction between the church and the college. This article said that the Indians made a "grant" to the church and the college. This grant was of an undivided one-half of the land at Macon to the church and another undivided one-half to the college. Also grants of undivided fractional interests in the unlocated three sections were made equally to the church and the college. Years later in 1826, the college and the church agreed to swap the undivided interest of the college (now the University of Michigan) in the land at Macon for the undivided interest of the church in the unlocated sections. (Def Ex 24, p 112.) This Court can reasonably infer from the grant of undivided interests that the Indians made no clear distinction between the church and the college because to them Father Richard was both the church and the college. Throughout this case, the Court has tried to construe the treaty provisions in favor of the Indians, as mandated by *Pillager Bands of Indians, Minnesota v United States, supra,* but the above inference is one more example to show that no trust was intended in this case.

As stated previously, this Court finds that Arti-

cle 16 of the treaty did not create an express trust. The University of Michigan, or Catholepistemiad, was only a month old when the Treaty of Fort Meigs was signed. Its founders were Father Richard, Reverend Monteith, Lewis Cass and a small handful of other Detroit leaders. Lewis Cass acted as one of two United States treaty commissioners on behalf of the United States government at the 1817 treaty. He did not act for the university; the defendant university was not a party to the treaty, and, in this Court's opinion, made no undertaking, express or implied. Looking to the language of Article 16, this Court does not find the declaration of a trust. The absence of the words "in trust" from the treaty is not fatal, but there must be some sort of declaration beyond a mere expression of wish or hope if a trust is to be created. *Osius v Dingell,* 375 Mich 605; 134 NW2d 657, 660 (1965). The creation of a trust requires an intent to do so on the part of the settlor and some objective manifestation of that intent. The intention should be specifically to create a trust and not to do something else, as to create a gift or to make a transfer of property. 22 MLP 524, Trusts, § 11; 54 Am Jur, Trusts, § 33, p 44.

Intent to create a trust has been found lacking where no enforceable duties of the grantee were stated in the instrument. *Townsend v Gordon,* 308 Mich 438; 14 NW2d 57 (1944). In that case the Court quoted from the Restatement of the Law of Trusts, vol 1, § 125, as follows:

"If property is transferred to a person to be disposed of by him in any manner or to any person he may select, no trust is created and the transferee takes the property for his own benefit.

"The comment is as follows:

"A. The general rule. Whether the transferor has

manifested an intention to give property to a person in trust or to give it to him for his own benefit is a question of interpretation of the transferor's language in the light of all the circumstances.

"No trust is created if the transferor does not manifest an intention to impose enforceable duties upon the transferee. His intention not to impose enforceable duties may be shown by the fact that he uses precatory rather than mandatory words (see § 25). Even though the purpose to which he desires the transferee to apply the property is clearly something other than for the personal benefit of the transferee, no trust is created if the settlor manifested an intention to impose merely a moral obligation, and to leave the transferee free from any legal obligation to apply the property to the purpose (see § 25, comment b). His intention not to impose enforceable duties may appear from the fact that the purposes to which the property is to be applied are so broad as to show that the transferor intended that the transferee should be entitled to use the property for his own benefit."

See *Brooks v Gillow,* 352 Mich 189 [89 NW2d 457] (1958); *Faulds v Dillon,* 231 Mich 509 [204 NW 733] (1925).

The question of interpretation of treaties was discussed in *United States v Choctaw [& Chickasaw] Nations,* 179 US 494 [21 S Ct 149; 45 L Ed 291] (1900), wherein the Supreme Court was required to determine whether a particular Indian treaty created an outright cession of land or a transfer in trust. The Court stated at 532 that:

"* * * a treaty between the United States and an Indian tribe must be construed not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians. But in no case has it been adjudged that the courts could by mere interpretation or in deference to its view as to what was right under all the circumstances, incorporate into an Indian treaty

something that was inconsistent with the clear import of its words. It has never been held that the obvious, palpable meaning of the words of an Indian treaty may be disregarded because, in the opinion of the court, that meaning may in a particular transaction work what it would regard as injustice to the Indians. That would be an intrusion upon the domain committed by the Constitution to the political departments of the Government."

This language used by the United States Supreme Court in 1900 seems appropriate to the immediate case. If the plaintiffs wish more Indian scholarships, their recourse should be to the "political departments" of the government, namely the legislative and the Board of Regents. As the Supreme Court further stated at 533 in the *Choctaw Nation* case, "this court does not possess any treaty-making power. That power belongs by the Constitution to another department of the Government, and to alter, amend or add to any treaty by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power and not an exercise of judicial functions."

Next, the Court will discuss the word "grant". The Court finds that the word "grant" is the same as cede or convey. The use of this word "grant" in the 1817 treaty is final and unequivocal. It has the same meaning as "cede" in the *Choctaw* case. The immediate case is stronger since the "grant" is coupled with the express right of disposition of the land on the part of the grantee.

The same interpretation of "cede" was made in *Pillager Bands of Chippewa Indians, Minnesota v United States,* 428 F2d 1274 (Ct Cl, 1970). It was asserted that the treaty language created a trust. The Court said:

"* * * this would normally on its face be a contractual understanding or undertaking, forming part of the consideration paid to the tribe, not the implicit creation of a trust by which the Pillagers continued to have an interest in land which they would not thereafter use or occupy * * *.

\* \* \*

"The basis for implying a trust is far too slight, even though we read the Treaty liberally in favor of the Indians, as we must."

This Court has also attempted to construe the 1817 treaty in favor of the Indians, but it still arrives at the conclusion to a reasonable historic certainty that the Indians understood they were making a gift. There was extensive testimony to this effect by defendant's expert witness, Dr. Helen Hornbeck Tanner. Her testimony was also supported by Def Exs 1, 3, 4, and 5. The Court has reviewed all of the testimony and finds that during the period of time referred to in this trial, roughly the first half of the 19th century the plaintiff tribes were disinterested and sometimes hostile toward formal education. By no stretch of the imagination can we conclude that in 1817 the plaintiff tribes envisioned a university-type education for their descendants. Plaintiffs' Exhibit B includes letters from Duncan McArthur in which the Indians under Colonel Lewis are described as wanting teachers for their children, and the Indians at Lewistown request the President to send teachers. But Dr. Tanner testified that Colonel Lewis was a Shawnee and that the Indians at Lewistown were Shawnees. The Shawnees are not part of this action. Dr. Tanner's testimony included reference to several specific incidents showing Indian hostility toward education. The Court will not mention every incident, but notes that an

1821 Indian school effort at Port Huron was abandoned in 1823 because, even though the mission hired a recruiter to recruit Indian students, he was unable to do so.

It further appears to the Court that planning for the future was not an attribute of the Indian character in the early 19th century. The Court does not wish to criticize the Indians but must look to their intent in 1817, not 1979. Plaintiffs' Exhibit A, p 59, alludes to this lack of foresight:

"An element of Tecumseh's leadership which differentiated him sharply from the ordinary characteristic of his race was his foresight. While the average Indian, accustomed to the bounties of nature, lived each day without much thought for the morrow, the Shawnee chief continually planned and contrived in order to meet the coming requirements."

Dr. Tanner also expressed this concept. She testified at the Grand Rapids fishing treaty case as follows:

"Indian people do not have a concept of time like Western people. Our view of time is linear, it is chronological, a long string. There is time in front of us and time behind us.

"This chronological measured concept is not common to Indian people. Their time and spacial relationships are very much intermixed; and some people have characterized the Indian people as living in a continuous present that goes along with them." (Def Ex 29, p 516.)

Dr. Tanner further testified that she had been unable to find any reference in the literature of the 19th century which regarded Article 16 of the treaty as a trust. It was called a gift by the Richard biographers, Def Ex 2, p 124; Wilfred B.

Shaw's Encyclopedia, Def Ex 25, p 29; and by
Henry McLaughlin in 1891, Def Ex 23.

Mr. Richard Peters, a lawyer, who annotated the
Kappler version of the Fort Meigs Treaty in 1846,
called it a "grant for the education of Indian
children".

Plaintiffs further claim that a trust is recognized
by certain language in § 8 of the 1821 Act reestabl-
ishing the university and transferring property
from the 1817 university corporation to the 1821
corporation. Plaintiffs argue that the phrase "sub-
ject nevertheless to the uses, trusts, and purposes
for which the property was granted, given, con-
veyed or promised", which appears at the end of
§ 8, modifies the opening phrase of the section
dealing with Article 16 of the Fort Meigs Treaty.
The pertinent language of § 8 is as follows:

"Section 8. *And be it enacted,* That the three sections
of Land, granted to the College of Detroit, by the treaty
of Fort Meigs, concluded September the twenty-ninth,
one thousand eight hundred and seventeen, shall be
vested in the said trustees, agreeably to the terms of
the grant, and all the property, real, personal and
mixed, and all rights, credits and debts, granted, given,
conveyed, promised or due to the corporation estab-
lished by the act, entitled 'An act to establish a Catho-
lepistemiad or University of Michigania,' shall be
vested, and are hereby vested in the corporation estab-
lished by this act; subject nevertheless, to the uses,
trusts and purposes for which the same property was
granted, given, conveyed or promised; * * *." Univer-
sity of Michigan Early Records 1817-1837. (Def Ex 24, p
14.)

If we accept plaintiffs' argument, we would ignore
the intervening clause of § 8 which is directed to
transferring other property of the 1817 corpora-
tion, including the property described in § 7 of the

1821 Act. This Court finds that § 8 deals with two types of property: 1) Article 16 lands and 2) other property of the university. The phrase concerning uses, trusts, and purposes modifies only the latter property of the university. The Court emphasizes at this point that it is interpreting a legislative act rather than an Indian treaty, and the liberal interpretation rule does not apply. Article § 8 only says "argreeably to the terms of the grant" in relation to the Fort Meigs lands. Nothing is mentioned of a trust, and here we are dealing with a legislative enactment. As to the other lands this Court concludes that the University would be the beneficiary of any trust imposed on these other lands and not anybody else.

Going back to the Article 16 language, this Court notes that the treaty did not say, "to the corporation of the College of Detroit for the use of the Indian tribes", rather it said "to the corporation of the College at Detroit for the use of the said College". This Court finds that the treaty language does not create a "use" in the old common-law concept of "uses" before the modern law of trusts. The Court notes that if it follows plaintiffs' argument literally it would read the treaty as follows: lands to A (university) for the use of A (university). Plaintiffs try to use the preposition *to,* instead of the actual preposition of the treaty language, *for.* By no stretch of the imagination can this Court construct a *use to* the plaintiff Indian tribes.

Plaintiffs further argue that the treaty language and other documents must be construed against their draftsmen. While this is true as a general proposition of law there is not a preponderance of the evidence here that Lewis Cass was the draftsman of Article 16, as well as the 1821 Act. In fact

Lewis Cass is not a defendant in this case. Plaintiffs say:

"The law is this. If the *defendant* makes a written statement that he recognizes the trust, then he is a trustee."

This is true, but one can be a trustee only if the other conditions of a trust are present. In this case, neither the Michigan Legislature of 1821, the governor and judges nor Lewis Cass is the defendant. The university did not draft the treaty and did not enact the 1821 law. This Court does not consider this case a contract of adhesion since neither the treaty nor the 1821 statute was prepared by the defendant university.

Plaintiffs cite *Minnesota v Hitchcock,* 185 US 373; 22 S Ct 650; 46 L Ed 954 (1902) as strikingly similar to the instant case on the issue of judicially determining the understanding of the Indians. That case involved the claim of Minnesota to lands that were set aside as an Indian reservation. Section 7 of the statute (establishing a commission to negotiate with the Indians) provided that some of the land obtained from the Indians would be sold and the proceeds of sale would be "devoted exclusively to the establishment and maintenance of a system of free schools among said Indians". 185 US 377-378. The Minnesota case clearly established a trust; it is no authority for the case at bar. There was specific trust language in the Minnesota case. The trust *res* is provided by the sale of certain Indian lands; the United States was to act as trustee, with the funds placed in the Treasury of the United States to the credit of all the Chippewa Indians in the State of Minnesota.

The university received title to the land in 1824 from the United States, who was the other party

to the treaty of 1817 (Pl Ex D, pp 13, 14.) The patent from the United States uses the following language:

"It is therefore granted by the United States unto the Trustees of the University of Michigan formerly the Corporation of the College of Detroit the Tracts of Land above described: To have and to hold, the said tracts, with the appurtenances, unto the said Trustees of the University of Michigan, and to their successors in Office."

The patent gave the defendant unconditional title the same as the language of Article 16 gave defendant the absolute right to dispose of the land if it wished. The language of these two documents dated within seven years of each other indicates to this Court the absence of any intent to create a trust by either of the parties to the treaty.

The Court finds that in 1817 the legal and equitable title to the three then indicated sections which are the subject of this lawsuit merged in the United States. From 1790 on, Indians could not own fee simple title. All they had was a right of occupancy, sometimes called Indian title and terminable by the sovereign act of the United States. See *Oneida Indian Nation v County of Oneida,* 414 US 661, 667 [94 S Ct 772; 39 L Ed 2d 73] (1974); *Bennett Co, SD v United States,* 394 F2d 8, 11 ([CA 8,] 1968). Here is where the difficulty with this case arises. Actually all the Indians had was a right of occupancy (Indian title) which was terminable by the sovereign act of the United States. The Federal government possesses the power to convey the fee to lands occupied by Indian tribes and all questions with respect to rights of occupancy and conditions of extinguishment of Indian title are solely for the Federal government. This

Court will concede that in 1817 the Indians could have imposed an express trust on the lands possessed by them and granted to the church and college by the 1817 treaty but this was simply not done at that time.

Further, this Court finds that no constructive trust should be imposed upon the defendant. This Court, in its opinion denying defendant's Motion for Summary Judgment (April 1, 1974) stated:

"Any constructive trust to prevent unjust enrichment would depend upon the facts surrounding the treaty signing and the relationship and knowledge of The University of Michigan (college at Detroit) concerning any actual or constructive fraud or abuse of confidence which may have occurred." (Citations omitted.)

The Court has now heard all the witnesses and examined the exhibits. It finds that the university was not even a party to the treaty, and committed no fraud or abuse of confidence in the treaty negotiations.

The Indians were represented at the making of the 1817 treaty by interpreter Peter Ryley and by Indian agent John Johnson. Peter Ryley was an accomplished interpreter and agent Johnson was a trusted and respected, honest agent for the Indian people. From the record the Court does not find any unjust conduct on the part of the United States. The principal objective of the Treaty of Fort Meigs in 1817 was to secure from Indian tribes a land cession which would link tracts of land in Michigan and in Ohio ceded by two earlier treaties. The treaty was basically an Ohio treaty, but some Michigan lands were involved. The purpose was to extinguish the Indian title to all land within the State of Ohio, established in 1803.

The facts of this case do not fit in with plaintiffs'

theory of unjust enrichment and unjustness. Even if the Indians intended a *quid pro quo* in Article 16 (which the Court seriously doubts), the lands transferred by Article 16 were of minimal value at that time. The plaintiff tribes did not have fee simple to the land then, and three of the six sections were not even located and identified in 1817. In 1817, all that changed hands was the intangible right to locate some land for future delivery, subject to the approval of the United States. The record in this case discloses that after the university acquired title to the three unlocated sections, efforts to sell it were unsuccessful for a long period.

Plaintiffs cite *Kobogum v Jackson Iron Co,* 76 Mich 498 [43 NW 602] (1889), and *Compo v Jackson Iron Co,* 49 Mich 39 [12 NW 901] (1882), and 40 Mich 578 [16 NW 295] (1883) in support of their claim of a constructive trust, but these cases are distinguishable. Defendant's agreement to pay plaintiff's ancestor for his service in assisting defendant to locate a mine was in writing and contained a definite description of the land; it also contained a definite description of the consideration upon which the agreement rested. The claim in Kobogum was "unconditional and absolute" and the claimants had made repeated efforts over a period of thirty (30) years to collect on an 1846 claim. The defendant mining company was enormously enriched in amounts which were definitely ascertainable; it had made an express promise which it had broken.

In conclusion, this Court finds that neither the element of unjustment nor the element of enrichment necessary to support plaintiffs' claim for a constructive trust is present in this case. The record fails to show any evidence of "fraud, mis-

representation, concealment, undue influence, duress, taking advantage of one's weakness or necessities or any other similar circumstances, which render it unconscionable for the holder of the legal title to retain and enjoy property", which are the prerequisites for the imposition of a constructive trust. See *Racho v Beach,* 254 Mich 600, 606 [236 NW 875] (1931); *Chapman v Chapman,* 31 Mich App 576, 580 [188 NW2d 21] (1971).

This Court has limited itself to the consideration of whether there is an actual or constructive trust created by the 1817 treaty in favor of plaintiff tribes. It has determined that there is no actual or express trust. It is unnecessary at this time to determine whether plaintiffs' rights were abrogated by subsequent treaties since this aspect of the case was not fully argued at trial. This Court would be inclined to rule, however, that subsequent treaties only abrogated equitable claims against the United States. This Court would further rule that the defense of laches not be applied to bar plaintiffs' claim in the instant case. But again this Court does not feel that this defense was thoroughly argued at trial.

THEREFORE, this Court rests its decision solely on the question whether there is an actual or constructive trust in favor of plaintiff tribes. It has determined that there is no trust, expressed or otherwise, and, ACCORDINGLY, plaintiffs' claim is denied and a Judgment of No Cause of Action is entered in favor of defendant.

*/s/ Edward D. Deake*

Edward D. Deake, Circuit Judge